**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| PREMIER AUTOMATION, LLC, | No. |
| Plaintiff, | |
| | Judge |
| v. | |
| CUSTOM GLASS SOLUTIONS, LLC, | |
| Defendant. | |

**COMPLAINT**
**DEMAND FOR JURY TRIAL**

Plaintiff Premier Automation, LLC, by and through its legal counsel, Houston Harbaugh, P.C., files this Complaint and states as follows:

**A.  Parties.**

1.    Plaintiff Premier Automation, LLC ("Premier") is a Pennsylvania limited-liability company with its principal place of business at 1050 Rico Road, Monroeville, PA 15146. The sole member of Premier is Premier Automation Holdings, Inc., a Pennsylvania corporation, and accordingly Premier is a citizen of Pennsylvania.

2.    Defendant Custom Glass Solutions, LLC ("CGS") is a Michigan limited-liability company with its principal place of business at 12688 State Highway 67, Upper Sandusky, OH 43351, and a second place of business in Ohio at 130 West Jones Road, Fostoria, OH 44830.

3.    Upon information and belief, no member of CGS is domiciled in the Commonwealth of Pennsylvania.

**B.  Jurisdiction and Venue.**

4.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the damages sought exceed $75,000 in value exclusive of interest and costs, and there is complete diversity of citizenship between the plaintiff and defendant.

5. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events or omissions giving rise to the plaintiff's claims occurred in this judicial district, CGS resides and is subject to personal jurisdiction in this judicial district, and the parties' agreement contains a venue clause setting venue in the federal courts for Cuyahoga County, OH.

**C.  Facts common to all causes of action.**

6. Premier is an engineering company specializing in custom solutions for industrial automation, drive systems, robotics integration, and contract manufacturing.

7. CGS is a manufacturer of glass products for automotive, commercial-transportation, construction, agriculture, law-enforcement, and other applications.

8. On or about November 4, 2024, Premier provided CGS with a quotation (Quotation 19898-04) for a custom Automated Rack Unload and Seaming System for CGS's Fostoria, OH facility (the "System"). (A copy of Premier's quotation is attached as Exhibit A.)

9. The quoted amount for the System was $1,330,000, with a potential discount of $13,300. (Exhibit A, p. 11.)

10. On or about November 12, 2024, CGS responded to Premier's quotation with a purchase order (Purchase Order 27106404), which accepted Premier's quotation for the System in the amount of $1,316,700. A copy of the Purchase Order is attached as Exhibit B.

11. CGS also accepted Premier's offer of installation and setup fees in an estimated amount of $76,000, and CGS further requested a conveyor replacement in the amount of $33,250. (Exhibit B, pp. 1–2.)

12. The total price for all goods and services was $1,425,950. (Exhibit B, p. 2.)

13. The System is a highly customized solution that required Factory Acceptance Testing ("FAT") and validation using CGS supplied production materials prior to shipment.

14. The purchase order stated the following payment terms for the System:

- 10% with order

2

- 30% with mechanical and electrical drawing review, supplier's project schedule, and preliminary spare parts list (net 45)
- 50% after preliminary acceptance, part setup training, and shipment (net 45)
- 10% after startup, system operation training, final acceptance, and receipt of documentation. Drawings must reflect as-built state after final acceptance. (net 45)
- Installation & Startup – 100% upon completion (Net 30)

(Exhibit B, p. 2.)

15. Hence, the parties' contract called for 100% payment of the $1,316,700 price for the System upon "startup, system operation training, final acceptance, and receipt of documentation." (Exhibit B, p. 2.)

16. The parties' contract called for 100% of the payment for installation and startup upon completion. (Exhibit B, p. 2.)

17. Premier invoiced CGS, and CGS paid Premier, for the 10% "order" and 30% "mechanical and electrical drawings" milestones, and thus CGS has paid Premier 40% of the $1,316,700 price for the System.

18. Premier delivered and installed the System to CGS's Fostoria, OH factory in December 2025, which comprised preliminary acceptance, part setup training, and shipment and entitled Premier to payment of the 50% "preliminary acceptance" milestone.

19. Premier provided startup, system operation training, final acceptance, and system documentation to CGS, which entitled Premier to payment of the final 10% "startup and final acceptance" milestone.

20. The System is currently fully operational and is being currently used by CGS to produce glass products.

21. Hence, installation and startup is complete, and Premier is further entitled to payment for installation and startup.

22. Accordingly, under the payment terms listed in CGS's own purchase order, Premier is entitled to 100% of the price for the System (including the additional conveyor) because final

3

acceptance and all accompanying milestones have taken place, and Premier is further entitled to 100% of the costs for installation and startup because installation and startup is complete.

23. Despite Premier's performance under the parties' contract, CGS has failed to pay multiple of Premier's invoices as follows, all which are past due:

| Invoice | Due Date | Amount | Description |
|---|---|---|---|
| 32664 | 1/8/2026 | $24937.50 | Infeed Conveyor Replacement |
| 32665 | 1/8/2026 | $658,350.00 | Unload and Seaming System 50% Preliminary Acceptance |
| 32714 | 1/17/2026 | $11,450.00 | Freight |
| 33246 | 4/2/2026 | $131670.00 | Unload and Seaming System 10% Final Acceptance |
| 33308 | 4/10/2026 | $76,000.00 | Installation & Startup |
| 33809 | 3/26/2026 | $3,968.87 | Installation & Startup Overage (Service) |

24. The total amount of all outstanding invoices is $906,376.37, all of which are immediately payable and past due.

25. The youngest of the invoices is overdue by over 90 days. The oldest is overdue by over 180 days.

26. In or about February 2026, personnel with CGS, including "V.P. of Supply Chain" Chad Miller, began to demand that Premier provide CGS with a credit in an amount in excess of $400,000, based on allegations that the System was delivered late.

27. Premier has refused CGS's demands and has repeatedly demanded payment in full from CGS.

28. To date, despite repeated demands, CGS has refused to pay Premier the $906,376.37 balance that is immediately payable and past due.

**D. Causes of Action.**

**1. First Cause of Action – Breach of Contract.**

29. Premier incorporates Paragraphs 1–28 of this Complaint as though set forth at length herein.

4910-7058-9892, v. 1

30. Premier's quotation was an offer to contract under Ohio's enactment of the Uniform Commercial Code, R.C. § 1301.101 et seq., and CGS's purchase order was an acceptance of Premier's offer and formed a binding contract.

31. The contract between Premier and CGS required CGS to pay 100% of the price of the System upon final acceptance, along with 100% of the price for installation and startup upon completion.

32. The System is installed and complete and Premier is entitled to payment of 100% of all amounts due to Premier under the parties' contract.

33. Despite Premier's entitlement to payment in full for all goods and services provided by Premier to CGS under the parties' contract, CGS has refused to pay Premier the amounts that are immediately payable and past due.

34. CGS's refusal to pay Premier is a breach of the parties' contract.

35. Premier has suffered damages from CGS's breach of contract in an amount no less than $906,376.37, which represents the balance that is immediately payable and past due.

36. By reason of the foregoing, CGS is liable to pay damages to Premier in an amount no less than $906,376.37, plus costs, interest, attorneys' fees, and such other and further relief that the Court deems just and proper.

**2. Second Cause of Action – Unjust Enrichment.**

37. Premier incorporates Paragraphs 1–28 of this Complaint as though set forth at length herein.

38. In the alternative to Count 1, and in the event there is no contract between Premier and CGS, Premier conferred a benefit upon CGS in the form of the System, installation, startup, freight, and other goods and services, all of which provided CGS with the functional System that is currently being used by CGS to produce automotive glass products in CGS Fostoria, Ohio factory.

4910-7058-9892, v. 1

39.    Under the circumstances, it would be unjust and inequitable for CGS to retain the benefit of the goods and services provided by Premier without paying the value of thereof.

40.    By reason of the foregoing, CGS is liable to pay Premier for the value of the benefit they received in an amount no less than $906,376.37, plus costs, interest, and such other and further relief that the Court deems just and proper.

### 3.    Third Cause of Action – Account Stated.

41.    Premier incorporates Paragraphs 1–28 of this Complaint as though set forth at length herein.

42.    Premier furnished CGS with goods and services for a custom Automated Rack Unload and Seaming System, installation and startup, freight, and related items for CGS's Fostoria, Ohio facility, which CGS received and is using.

43.    In connection with those goods and services, Premier issued invoices to CGS reflecting discrete amounts due, including:

| Invoice | Due Date | Amount | Description |
|---------|----------|--------|-------------|
| 32664 | 1/8/2026 | $24937.50 | Infeed Conveyor Replacement |
| 32665 | 1/8/2026 | $658,350.00 | Unload and Seaming System 50% Preliminary Acceptance |
| 32714 | 1/17/2026 | $11,450.00 | Freight |
| 33246 | 4/2/2026 | $131670.00 | Unload and Seaming System 10% Final Acceptance |
| 33308 | 4/10/2026 | $76,000.00 | Installation & Startup |
| 33809 | 3/26/2026 | $3,968.87 | Installation & Startup Overage (Service) |

44.    The foregoing invoices total $906,376.37.

45.    Premier presented these invoices to CGS, and CGS did not object to the amounts stated within a reasonable time and instead demanded a credit against the total purchase price.

46.    CGS retained and used the delivered and installed System, including after Premier's performance of installation and startup.

47.    CGS's failure to dispute the total amount of the invoices (instead demanding a credit against the amount owed) and its continued retention and use of the benefits reflected therein

6

constitute CGS's assent to, and acceptance of, the correctness of the account stated and CGS's promise to pay the balance due.

48. Premier demanded payment of the invoiced amounts, but CGS has refused to pay the $906,376.37 balance that is immediately payable and past due.

49. By reason of the foregoing, an account has been stated between Premier and CGS in the amount of $906,376.37, which CGS is obligated to pay, together with costs, interest, and such other relief as the Court deems just and proper.

**4. Fourth Cause of Action – Declaratory Judgment.**

50. Premier incorporates Paragraphs 1–28 of this Complaint as though set forth at length herein.

51. Premier's quotation was an offer to contract under Ohio's enactment of the Uniform Commercial Code, R.C. § 1301.101 *et seq.*, and CGS's purchase order was an acceptance of Premier's offer and formed a binding contract.

52. Premier's quotation was an offer to contract because it contained pricing, quantity, project specifications, payment terms, and was made "under circumstances evidencing the express or implied intent of the offeror that its acceptance shall constitute a binding contract." *Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999).

53. CGS's purchase order was an acceptance of Premier's offer because "[a] definite and seasonable expression of acceptance or a written confirmation that is sent within a reasonable time operates as an acceptance even though it states terms additional or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms." R.C. § 1302.10(A).

54. Under § 1302.10(B), "[t]he additional terms are to be construed as proposals for addition to the contract. Between merchants, the terms become part of the contract unless one of the following applies: (1) the offer expressly limits acceptance to the terms of the offer[;] (2) [t]hey

materially alter it[; or] (3) [n]otification of objection to them has already been given or is given within a reasonable time after notice of them is received." R.C. § 1302.10(B).

55.  Furthermore, for additional or different terms contained in an acceptance to become part of the contract under R.C. 1302.10(B), "it is not enough that an acceptance is expressly conditional on additional or different terms; rather, an acceptance must be expressly conditional on the offeror's *assent* to those terms." *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1168 (6th Cir. 1972) (emphasis in original).

56.  In order for an offeree's acceptance to reject the offeror's terms and conditions and supersede those terms and conditions with its own terms and conditions, the language of the offeree's acceptance must "clearly reveal[] that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein," and that acceptance is predicated on the offeror's assent must be "directly and distinctly stated or expressed rather than implied or left to inference." *Dorton*, 453 F.2d at 1168.

57.  Both Premier and CGS are merchants.

58.  CGS's purchase order states, "Acceptance of this Purchase Order is limited to CGS Terms, and CGS expressly objects to any other additional or different terms in Supplier's quote or any other document provided by Supplier." (Exhibit B, p. 4.)

59.  CGS's purchase order, however, does not state that CGS's acceptance of Premier's offer was expressly conditioned upon Premier's *assent* to CGS's terms and conditions.

60.  CGS's purchase order purported to incorporate CGS's General Terms & Conditions of Purchase, specifically Attachment B for Terms and Conditions for Indirect Purchasing (hereafter "CGS's Terms of Purchase"). (A copy of CGS's Terms of Purchase is attached as Exhibit C.)

61.  CGS's Terms of Purchase do not state that CGS's acceptance of an offer is expressly conditioned upon the offeror's *assent* to CGS's additional or different terms and conditions.

62.  CGS's Terms of Purchase do not state that CGS's is unwilling to proceed with a transaction unless the offeror expressly assents to CGS's additional or different terms and conditions.

8

4910-7058-9892, v. 1

63.   Hence, CGS's purchase order operated as an acceptance of Premier's offer under R.C. 1302.10.

64.   Contrary to CGS's purchase order and CGS's Terms of Purchase, Premier's own General Terms and Conditions of Sale (hereafter "Premier's Terms of Sale"), which were included in Premier's quotation, state: "Acceptance by Premier Automation LLC … of any purchase order or other offer … to purchase products and services … is expressly conditioned on Buyer's assent to the following terms and conditions …, which assent shall be deemed to have been given by Buyer's submission of any such Order[.]" (Exhibit A, p. 12.)

65.   Further, Premier's Terms of Sale say, "Any terms and conditions which oppose, deviate from or add to these terms and conditions shall be void and unenforceable unless modified by a written agreement executed by a duly authorized representative of Seller."

66.   Via a letter dated July 31, 2026, executed by Ken Panko, who is Premier's Vice President and a duly authorized representative of Seller, Premier accepted the venue and choice-of-law provisions in Paragraph 8.7 (Applicable Law and Jurisdiction) of Attachment B of CGS terms and conditions.

67.   The same letter stated that Premier rejects, and did not accept, all other provisions of CGS terms and conditions, including, without limitation, all other paragraphs of Attachment A and Attachment B thereto.

68.   Accordingly, except for the paragraph concerning venue and choice of law, Premier has not otherwise agreed in writing to modify Premier's Terms of Sale in regard to the sale to CGS or to accept any other terms and conditions opposing, deviating from, or adding to Premier's Terms of Sale, and Premier has stated that it expressly rejects CGS's Terms of Purchase other than Paragraph 8.7 (Applicable Law and Jurisdiction) of Attachment B.

69.   Accordingly, because Premier's offer and Premier's Terms of Sale expressly limited acceptance to the terms of Premier's offer, the additional and different terms proposed by CGS's Terms of Purchase did not become part of the parties' contract under R.C. § 1302.10(B) because Premier's offer expressly limited acceptance to the terms of its own offer. The only exception is

9

Paragraph 8.7 (Applicable Law and Jurisdiction) of Attachment B, which Premier accepted in writing.

70.    Further, CGS's purchase order and CGS's Terms of Purchase do not "directly and distinctly state[] or express[]" that CGS was unwilling to proceed with the transaction with Premier unless Premier assented to CGS's terms.

71.    On the contrary, Premier's Terms of Sale indicate that Premier's own performance is expressly conditioned on the CGS's *assent* to Premier's General Terms and Conditions of Sale.

72.    Hence, while CGS's purchase order and CGS's Terms of Purchase do not indicate that CGS was unwilling to proceed unless the other party assented to CGS's own terms, Premier's quotation and Premier's Terms of Sale do indicate that Premier was unwilling to proceed unless the other party assented to Premier's own terms.

73.    Consequently, CGS's acceptance of Premier's offer was not effective to either reject Premier's Terms of Sale or to include in the partes' contract the additional or different terms proposed by CGS's Terms of Purchase.

74.    Rather, under R.C. § 1302.10(A) and *Dorton v. Collins & Aikman Corp.*, CGS's purchase order operated as an acceptance of Premier's offer, including Premier's Terms of Sale, and CGS's Terms of Purchase must be construed as merely an offer for additional terms, which (except as to Paragraph 8.7 (Applicable Law and Jurisdiction) of Attachment B) Premier rejected pursuant to R.C. § 1302.10(B) by stating that Premier's offer was expressly conditioned on the buyer's assent to Premier's own terms.

75.    Accordingly, except for Paragraph 8.7 (Applicable Law and Jurisdiction) of Attachment B to CGS's Terms of Purchase, Premier's Terms of Sale govern the transaction between Premier and CGS, and CGS's Terms of Purchase (except for Paragraph 8.7 (Applicable Law and Jurisdiction) of Attachment B) do not apply and do not govern the transaction between Premier and CGS because they were not incorporated into the parties' contract.

76.    Premier anticipates, however, that CGS will assert that its own CGS's Terms of Purchase will apply instead of Premier's terms and conditions.

4910-7058-9892, v. 1

77. CGS has previously stated to Premier's personnel that CGS is entitled to damages from Premier in the form of lost profits, loss of income, and employee expenses.

78. Those are all types of consequential damages. *See*, *e.g.*, *Wellington Corp LLC v. Gennari Consulting, Inc.*, 631 F.Supp.3d 464, 474 (N.D.Ohio 2022) (lost profits are consequential damages); *Natl. Mulch & Seed, Inc. v. Rexius Forest By-Products Inc.*, 2007 WL 894833, *28 (S.D.Ohio Mar. 22, 2007) (increased costs of labor are consequential damages).

79. Premier's Terms of Sale, however, expressly exclude consequential and indirect damages: "IN NO EVENT SHALL SELLER BE LIABLE FOR ANY LOSS OF INCOME, LOSS OF PROFITS, OR CONSEQUENTIAL, PUNITIVE OR INDIRECT DAMAGES WHATSOEVER." (Exhibit A, p. 12.)

80. Further, CGS has previously stated to Premier's personnel that time was "of the essence" for the delivery of the System, and CGS has asserted that Premier's delivery of the System was late.

81. Under Premier's Terms of Sale, however, "All shipping information given to Buyer, including shipping and delivery dates, represents only the best estimates of the Seller," which evidences that time was not of the essence. (Exhibit A, p. 12.)

82. By reason of the prior demands made by CGS, an actual, substantial, and immediate controversy exists between the parties as to which party's contractual terms and conditions are controlling (i.e., there is a dispute comprising a UCC "battle of the forms"), and a declaration from this Court will resolve that controversy and settle the parties' legal relations, including disputes as to whether consequential damages are available and whether time was of the essence.

83. Further, under Premier's Terms of Sale, "If payment is not received by Seller when due, any outstanding amount shall bear interest at the monthly rate of 1.5% (18% per year) or, if less, the highest rate permitted by applicable law, payable on the first day of default and on the first day of every month thereafter until paid in full." (Exhibit A, p. 12.)

4910-7058-9892, v. 1

84. Under Premier's Terms of Sale, "Buyer also shall pay to Seller, on demand, all expenses, including reasonable legal fees, incurred by Seller in enforcing any of its rights to payment for the Products purchased by Buyer." (Exhibit A, p. 12.)

85. Because Premier's Terms of Sale govern the transaction between Premier and CGS, these provisions are incorporated into, and apply to, the transaction between Premier and CGS.

86. By reason of the foregoing, Premier is entitled to a declaratory judgment: (1) declaring that Premier's Terms of Sale and not CGS's Terms of Purchase (except for Paragraph 8.7 (Applicable Law and Jurisdiction) of Attachment B) govern the transaction between Premier and CGS; (2) declaring that of income, loss of profits, and consequential, punitive, and indirect damages have all been excluded and may not be recovered by CGS; (3) declaring that delivery dates were only estimates and that time was not of the essence; (4) declaring that Premier is entitled to interest on all past-due amounts at the rate of 1.5% per month or 18% per year; (5) declaring that Premier is entitled to the payment of all reasonable legal fees incurred by Premier in enforcing its rights to payment from CGS; and (6) ordering and such other and further relief that the Court deems just and proper.

## E. Prayer for Relief.

WHEREFORE, Premier prays that judgment be entered against CGS as follows:

(a) On the FIRST cause of action, a judgment against CGS in an amount no less than $906,376.37, plus costs, interest, and attorneys' fees.

(b) On the SECOND cause of action, a judgment against CGS in an amount no less than $906,376.37, plus costs and interest.

(c) On the THIRD cause of action, a judgment against CGS in an amount no less than $906,376.37, plus costs and interest.

(d) On the FOURTH cause of action, a declaratory judgment from the Court:

(1) declaring that Premier's General Terms and Conditions of Sale govern the transaction between Premier and CGS (except for Paragraph 8.7 (Applicable Law and

12

4910-7058-9892, v. 1

Jurisdiction) of Attachment B); (2) declaring that of income, loss of profits, and consequential, punitive, and indirect damages have all been excluded and may not be recovered by CGS under any circumstances; (3) declaring that delivery dates were only estimates and that time was not of the essence; (4) declaring that Premier is entitled to interest on all past-due amounts at the rate of 1.5% per month or 18% per year; (5) declaring that Premier is entitled to the payment of all reasonable legal fees incurred by Premier in enforcing its rights to payment from CGS; and (6) ordering and such other and further relief that the Court deems just and proper.

(e)   Granting Premier such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: August 4, 2026

_____

Samuel H. Simon
OH No. 0062455
HOUSTON HARBAUGH, P.C.
401 Liberty Avenue, 22nd Floor
Three Gateway Center
Pittsburgh, PA 15222
(412) 281-5060
(412) 281-4499 FAX
ssimon@hh-law.com
*Attorney for Plaintiff Premier Automation, LLC*

13

4910-7058-9892, v. 1

**JURY DEMAND**

The Plaintiff demands a trial by jury on all issues triable by right.

Respectfully submitted,

Dated: August 4, 2026

_____

Samuel H. Simon
OH No. 0062455
HOUSTON HARBAUGH, P.C.
401 Liberty Avenue, 22nd Floor
Three Gateway Center
Pittsburgh, PA 15222
(412) 281-5060
(412) 281-4499 FAX
ssimon@hh-law.com
*Attorney for Plaintiff Premier Automation, LLC*

14

4910-7058-9892, v. 1